**AEB & ASSOCIATES DESIGN
GROUP, INC., Plaintiff,**

**v.**

**TONKA CORPORATION, Defendant.**

**No. 92 Civ. 0428 (SWK).**

United States District Court,
S.D. New York.

May 25, 1994.

Horner & Isaacs, P.C. by Daniel A. Eiger-man, New York City, for plaintiff.

Morrison & Foerster by Kim J. Landsman, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

This action for breach of an implied contract, unjust enrichment and misappropriation arises out of the development of a children's "Colorblaster" toy by defendant Tonka Corporation's ("Tonka") Kenner Products Division. Presently before the Court is Tonka's motion, pursuant to Federal Rule of Civil Procedure 56(b), for summary judgment. Plaintiff AEB & Associates Design Group, Inc. ("AEB") opposes the motion, and moves, pursuant to Federal Rule of Civil Procedure 15(a), for leave to amend its complaint to assert a claim for breach of contract. For the reasons set forth below, Tonka's motion for summary judgment is granted and AEB's motion to amend the complaint is denied.

## BACKGROUND [1]

### I. Kenner's Corporate Structure

Tonka is the successor in interest to Kenner Parker Toys, Inc. ("Kenner"). From March 1988 until January 1990, the responsibility for developing new products at Kenner was split between a "product concepts group" and an "advanced concepts group," both of which were employed at Kenner's headquarters in Cincinnati, Ohio. The product concepts group, headed by David Okada ("Okada"), was responsible for developing (1) line extensions of existing toys; (2) toys based on movie licenses; and, to a more limited extent, (3) new toy ideas in toy categories that traditionally had been part of Kenner's past successes. The advanced concepts group, headed by Howard Bollinger ("Bollinger"), met with outside inventors to come up with entirely new toy concepts.

The product concepts and advanced concepts groups were independent divisions at Kenner, both in physical distance and spirit. The groups were created to accommodate the

fact that Okada and Bollinger were senior vice presidents at Kenner and strong rivals. Accordingly, although the responsibilities of the two groups overlapped to some degree, they worked on separate floors of the Kenner office building, and the product concepts group was separated from Kenner's other departments by locked doors.

John Mayer ("Mayer"), who conceived and developed the Colorblaster toy, worked in the product concepts group. Mayer reported directly to Ronald Hayes ("Hayes"), vice president of product concepts and design at Kenner. Hayes, in turn, reported to Okada until January 1990, when Okada left the company. At that time, the advanced concepts group was folded into the product concepts group, under the direction of Bollinger.

### II. Development of the Colorblaster Toy [2]

The Colorblaster toy consists of a children's airbrush tool. Air that has been hand pumped into a canister is released from a nozzle and passes through a hole in the tip of a marker, spraying ink on paper. Stencils are provided with which children can create different designs.

In March 1988, Mayer conceived of the airbrush concept when he was asked by Hayes to come up with ideas for new toy designs. Mayer took notes on his ideas, expressing his idea for an airbrush toy as an "Air brush, Hand pump." *See* Note from John Mayer (March 2, 1988) (the "Note"). The idea was based on the design for commercial airbrushes used by artists. "Air brush" referred to a type of airbrush involving an air supply hose through which compressed air passed from a container into a valve containing an ink marker. "Hand Pump" referred to an air tank containing a hand pump mechanism.

In late June or early July 1989, Mayer began to work on the airbrush idea, and he turned a working prototype over to Kenner's engineering department in November 1989. The engineering department expressed con-

---

1. Except where noted, the following facts are taken from the pleadings, the parties' Rule 3(g) statements, and the affidavits and declarations submitted by both parties, with exhibits.

2. In 1976, a toy company named Ideal sold a toy called "Spray and Play," a toy spray-painting system involving a hand-held manually-powered spray gun.

cerns that the airbrush prototype would not be safe for children, however, and did not begin preparing specifications for mass-producing it until February 1990.[3] The Colorblaster toy eventually was introduced to Kenner's retailer accounts in the fall of 1990, and appeared in the Kenner showroom at the February 1991 New York toy fair (the "Toy Fair").

Mayer contends that he worked on the project independently, and that he did not receive suggestions from anyone in the advanced concepts group about the Colorblaster toy. Okada was "generally aware" of the fact that Mayer was working on an airbrush toy, but did not participate in its development. Hayes also did not assist Mayer, other than to suggest that Mayer use an insect sprayer as the hand-pumped vessel for holding compressed air in the first working prototype of the Colorblaster toy.[4]

### III. Development of the "Jet Art" Toy

AEB is engaged in product design, invention and development. Ken Hoare ("Hoare"), a principal of AEB, conceived of the idea for an airbrush toy in the spring of 1988, and made a prototype of it, naming the toy "Jet Art." The Jet Art prototype is based on the design for commercial airbrush tools, and consists of a canister, adapted from plumbing parts, into which air is pumped from a standard bicycle pump, requiring two hands to operate. One end of the canister is attached to a tube ending in a nozzle, into which a standard commercial marker can be affixed perpendicularly.

Kiscom, Inc. ("Kiscom"), formerly known as Kiss Communications, is a designers' representative. In the fall of 1986, AEB entered into an agreement with Kiscom, pursuant to which Kiscom was to submit toy ideas to toy companies, and any revenues received from products placed by Kiscom were to be divided equally between Kiscom and AEB. *See* the letter agreement, dated September 26, 1986, annexed to the Declaration of Kim J. Landsman, dated July 13, 1993 (the "Landsman Dec."), as Exh. "18."

Commencing on April 16, 1988, Kiscom presented the Jet Art submission to six toy companies, all of which rejected it. One of those companies, Fisher–Price, reviewed the submission pursuant to its "Policy and Agreement Concerning Ideas Submitted by Persons Outside of the Fisher–Price Toys Division of the Quaker Oats Company" (the "Fisher–Price Agreement"). Paragraph One of the Fisher–Price Agreement provided that "[t]he disclosure must be understood to be purely voluntary and is not made in confidence." *See* the Fisher–Price Agreement at ¶ 1, annexed to the Landsman Dec. as Exh. "52." The Fisher–Price Agreement provided further that "we are released from any liability in connection with the receipt and examination of your disclosure or in connection with our use or disclosure to others of any portion of your disclosure." *Id.* at ¶ 3.

### IV. The Confidentiality Agreement

On April 23, 1988, Kiscom and Kenner entered into a written contract entitled "Agreement to Hold Confidential" (the "Confidentiality Agreement"), which set forth the rights and obligations of the parties with respect to submissions presented by Kiscom to Kenner. The Confidentiality Agreement provided that Kenner was to hold in confidence information submitted to it by Kiscom, and was not to use this information unless an agreement to permit such use had been reached by the parties. *See* the Confidentiality Agreement at ¶ 3, annexed to the Landsman Dec. as Exh. "B." The term "use" was defined in the Agreement as the

---

**3.** AEB contends that, as late as a line review held on September 11, 1989, the Colorblaster toy was powered by a pre-pressurized air canister, rather than by a hand-pumping mechanism. According to AEB, Mayer replaced the canister with the hand pump after the line review, at the suggestion of someone who had seen the Jet Art submission. Tonka contends, however, that the original prototype, using a hand-pumping mechanism, was completed well before September 1989. Hayes and Mayer decided to replace the hand pump with a pre-pressurized canister for purposes of the line review, however, because Mayer was still experimenting with ways to maximize pressure from the hand pump.

**4.** A store receipt confirms that Mayer bought an insect sprayer on July 7, 1989. *See* receipt, annexed to the Declaration of Kim J. Landsman, dated September 3, 1993, as Exh. "FF."

"conscious consideration of such identified information followed by deliberate adoption thereof." *Id.*

The Confidentiality Agreement provided further, however, that Kenner would not be liable for the independent creation of a toy that was similar to an outside submission. *Id.* at ¶ 4(F). In addition, Kiscom did not have rights to ideas already known to Kenner or the public, and Kenner would not be liable if the idea had already been disclosed to a third party without restriction. *Id.* at ¶ 4(A)–(D).

Pursuant to the Agreement, Kiscom warranted that it did not represent any third party who had a claim to any concept disclosed to Kenner. *Id.* at ¶ 6. In addition, Kiscom was required to provide a written description of each item presented to Kenner. *Id.* at ¶ 1.

The obligations set forth in the Agreement extended for two years from the date of disclosure. *Id.* at ¶ 11. The Agreement provided further, however, that its terms "shall be in perpetuity unless modified or terminated as specified herein." *Id.* The Confidentiality Agreement also stated that it

> contains the entire understanding between the parties relative to the protection of information which may be exchanged, and supersedes any prior or collateral related communications and understandings, whether written or oral, between the parties.

*Id.* at ¶ 10.

## V. The Toy Submissions

In 1988, Bollinger primarily was responsible for meeting with outside inventors to consider product ideas for development by Kenner. He met with more than one hundred outside inventor groups in 1988, and saw several hundred submissions.

In the summer of 1988, Bollinger reviewed a submission for a children's airbrush toy

referred to as "Junior Airbrush." The "Junior Airbrush" toy used a hand pump to blow air across the felt tip of a water-based marker. The pumping mechanism required a child to pump separately for each single spray of air, however, and did not allow for continuous air flow. Bollinger rejected the "Junior Airbrush" submission because he believed that it would be too expensive to produce.

Thereafter, in November 1988, Bollinger met with Androc Kislevitz ("Kislevitz"), a principal of Kiscom, at Kenner's New York office to review, *inter alia*, the Jet Art submission (the "November 1988 Meeting"). Kenner contends that Bollinger rejected the Jet Art submission at this meeting, as it was too similar to the "Junior Airbrush" idea. In addition, Bollinger believed that the Jet Art toy would be too expensive to produce. Kislevitz contends, however, that Bollinger "appeared interested" in the Jet Art submission, and that he asked if AEB could make a prototype containing a battery-operated motor. *See* deposition of Kislevitz, dated January 6, 1993 (the "Kislevitz Dep."), at 104. At the time of this meeting, Bollinger was not aware that Mayer had also conceived of an idea for an airbrush toy.

Bollinger contends that he did not request any materials on the Jet Art submission, and that Kiscom did not send any materials concerning the Jet Art toy to Kenner's Cincinnati office.[5] Kislevitz contends, however, that he "thought" he sent Bollinger the prototype. *See* the Kislevitz Dep. at 106. Approximately two weeks later, Kislevitz allegedly informed Bollinger that AEB believed battery operation would be too costly. According to Kislevitz, Bollinger indicated that he would send the Jet Art submission back to him.

On December 17, 1988, Kiscom returned the Jet Art submission to AEB. It summarized the manufacturers' comments as: "Done before. Good toy. Not a definitive version of product concept." *See* Memoran-

---

5. The Jet Art submission also was not listed on records kept by Kenner's legal department of items that Bollinger requested from Kiscom, or records of items that Kenner actually received in its Cincinnati office from Kiscom. *See* records of items submitted, annexed to the Declaration of Denise James, dated August 31, 1993, as Exh.

"1." In addition, the Jet Art submission was absent from records kept by Bollinger's assistant of all outside submissions received by Kenner in Cincinnati. *See* record of outside submissions, annexed to the Declaration of Joan Barngrover, dated August 31, 1993, as Exh. "1."

dum from Kislevitz to Anthony Billotto of 12/17/88, annexed to the Landsman Dec. as Exh. "36."

## VI. The Complaint

Kiscom and AEB first learned of the existence of the Colorblaster toy when it was exhibited at the Toy Fair in February 1991. Subsequently, on January 17, 1992, AEB brought this action, alleging (1) breach of an implied contract (First Cause of Action); (2) unjust enrichment (Second Cause of Action); and (3) misappropriation (Third Cause of Action). With respect to its First Cause of Action, AEB alleges that Tonka

> accepted the submission of Jet Art to examine and evaulate [sic], thereby entering into a contract with plaintiff either to compensate plaintiff if defendant determined to manufacture Jet Art or to hold Jet Art and information about it in confidence if defendant determined not to manufacture Jet Art.

See Complaint, ¶ 19. AEB alleges further that Tonka breached this implied contract by "appropriat[ing] plaintiff's idea and design from plaintiff's plan and prototype model and us[ing] the same to produce, promote, market, and distribute a substantially similar item under its own trade name." Id. at ¶ 22. As for the Second Cause of Action, AEB alleges that Tonka "has been unjustly enriched to the cost and injury of the plaintiff." Id. at ¶ 27. The Third Cause of Action seeks to enjoin Tonka from manufacturing the Colorblaster toy.

Tonka now moves, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for summary judgment dismissing the complaint. AEB opposes this motion, and moves, pursuant to Federal Rule of Civil Procedure 15(a), for leave to amend its complaint to assert a claim for breach of contract.

## DISCUSSION

## I. Motion for Summary Judgment

### A. Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, de-positions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must initially satisfy a burden of demonstrating the absence of a genuine issue of material fact, which can be done merely by pointing out that there is an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." Eastway Constr. Corp. v. New York, 762 F.2d 243, 249 (2d Cir.1985); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–1609, 26 L.Ed.2d 142 (1970); Hathaway v. Coughlin, 841 F.2d 48, 50 (2d Cir.1988); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). But the Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and to grant summary judgment where the nonmoving's evidence is merely colorable, conclusory, speculative or not significantly probative. Id. at 249–50, 106 S.Ct. at 2510–11; Knight v. United States Fire Ins. Co., 804 F.2d at 12, 15; Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 45 (2d Cir.1986), cert. denied, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). To determine whether the nonmoving party has met his or her burden, the Court must focus on both the materiality and the genuineness of the factual issues raised by the nonmovant. As to materiality, "it is the substantive law's identification of which facts are critical and which

facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. A dispute over irrelevant or unnecessary facts will not preclude summary judgment, *id.*, but the presence of unresolved factual issues that are material to the outcome of the litigation mandates a denial of the summary judgment motion. *See, e.g., Knight v. United States Fire Ins. Co.*, 804 F.2d at 11–12.

Once the nonmoving party has successfully met the burden of establishing the existence of a genuine dispute as to an issue of material fact, summary judgment must be denied unless the moving party comes forward with additional evidence sufficient to satisfy his or her ultimate burden under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. at 330, n. 2, 106 S.Ct. at 2556, n. 2 (Brennan, J., dissenting). In sum, if the Court determines that "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)); *see also Weg v. Macchiarola*, 654 F.Supp. 1189, 1191–92 (S.D.N.Y. 1987).

## B. Breach of Implied Contract and Unjust Enrichment Claims [6]

Tonka moves for summary judgment dismissing the breach of implied contract and unjust enrichment causes of action on the grounds that any obligations between the parties are governed by the specific terms of the Confidentiality Agreement. For the reasons that follow, the Court finds that the Confidentiality Agreement controls the rights and obligations of the parties.

▮ An implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract. *See Radio Today, Inc. v. Westwood One, Inc.*, 684 F.Supp. 68, 71 (S.D.N.Y.1988). "[T]he prerequisite for such a contract is that there be no express agreement dealing with the same subject matter." *Id.; see also Julien J. Studley, Inc. v. New York News, Inc.*, 70 N.Y.2d 628, 518 N.Y.S.2d 779, 780, 512 N.E.2d 300, 301 (1987) (finding that a contract cannot be implied-in-fact where there is an express agreement dealing with the same subject matter); *La Vine v. La Vine*, 148 A.D.2d 926, 539 N.Y.S.2d 163, 164 (4th Dep't 1989) (same).

▮ Likewise, a "quasi contract" applies only in the absence of an express agreement, "and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment." *Clark–Fitzpatrick, Inc. v. Long Island R.R.*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). Thus, where an express agreement covers the subject matter of claims based on implied contract and unjust enrichment, such claims are precluded as a matter of law. *See Apfel v. Prudential–Bache Sec. Inc.*, 81 N.Y.2d 470, 600 N.Y.S.2d 433, 436–37, 616 N.E.2d 1095, 1098–99 (1993) (finding that Appellate Division erred in reinstating unjust enrichment claim where express agreement controlled parties' rights and liabilities).

▮ In the case at hand, Kiscom, not AEB, entered into the Confidentiality Agreement with Kenner. Accordingly, in order to determine whether AEB's implied contract and unjust enrichment claims may stand, the Court must first determine whether the Confidentiality Agreement is enforceable against AEB.

▮ "It is axiomatic that agents with proper authority can enter into contracts with third persons on behalf of their principals." *99 Commercial Street, Inc. v.*

---

**6.** As the Court has jurisdiction over this case based on diversity of citizenship, it shall apply the laws of the forum state. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Moreover, as the parties agree that there is no conflict between the law of Ohio, where Kenner is located, and the law of New York, where the November 1988 meeting took place, the Court shall base its decision on an analysis of New York law. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 816, 105 S.Ct. 2965, 2976, 86 L.Ed.2d 628 (1985) (finding that there could be no injury in applying a particular state's law where it is not in conflict with that of any other jurisdiction connected to the action).

*Goldberg,* 811 F.Supp. 900, 906 (S.D.N.Y. 1993). Thus, "[a] principal is bound to a third person by acts of another person when the principal has expressly given the latter authority to act on his behalf." *Skyline Agency, Inc. v. Ambrose Coppotelli, Inc.,* 117 A.D.2d 135, 502 N.Y.S.2d 479, 489 (2d Dep't 1986). Whether an agent has the authority to enter into such a contract "is determined 'from all the facts and circumstances of the case, in view of the object which the agent is appointed to accomplish.'" *Id.* (quoting 2A C.J.S. Agency, § 174).

AEB and Kiscom entered into an agreement pursuant to which Kiscom was to present AEB's ideas to toy companies, and the parties agreed to share any revenues generated from such presentations. As a result, the Court finds that Kiscom was expressly authorized to enter into the Confidentiality Agreement on AEB's behalf, and AEB is therefore bound by the Agreement. Accordingly, as the Confidentiality Agreement governs Kenner's obligations with respect to the Jet Art prototype, the Court finds that AEB's implied contract and unjust enrichment claims fail.

▮ AEB contends that the Confidentiality Agreement does not govern the parties' dispute, however, as the Agreement is an unenforceable contract of adhesion. Specifically, AEB claims that the Confidentiality Agreement is unenforceable as it was drafted by Kenner and signed by Kiscom without negotiation. AEB argues further that the Agreement is unenforceable as it is not within Kiscom's reasonable expectations, and is unconscionable. The Court disagrees.

▮ "Contracts of adhesion arise when a standardized form of agreement, usually drafted by the party having superior bargaining power, is presented to a party, whose choice is either to accept or reject the contract without the opportunity to negotiate its terms." *Finkle and Ross v. A.G. Becker Paribas, Inc.,* 622 F.Supp. 1505, 1511 (S.D.N.Y.1985). Such a contract will not be enforced against the weaker party when it is (1) not within that party's reasonable expectations; or (2) is unduly oppressive, unconscionable or against public policy. *Id.* at 1512.

The Court finds that the Confidentiality Agreement is not a contract of adhesion. First, AEB has failed to demonstrate that Kenner refused to negotiate the terms of the Confidentiality Agreement. In fact, the terms of the Agreement were accepted as written simply because Kiscom did not request any changes before executing it. In fact, Kenner often negotiates certain clauses of its confidentiality agreements upon request. *See* confidentiality agreements, annexed to the Declaration of James M. Kipling, dated September 2, 1993, as Exhs. "1" and "2." Accordingly, this is not a case in which Kiscom's choice was "either to accept or reject the contract without the opportunity to negotiate its terms." *Finkle and Ross v. A.G. Becker Paribas, Inc.,* 622 F.Supp. at 1511.

Second, the Court finds that the Confidentiality Agreement was both within the reasonable expectations of the parties and substantively fair. Thus, contrary to AEB's argument, by signing the Agreement, Kiscom did not "waive[ ] its and its client's rights to Jet Art." *See* Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl.Mem."), at 40. Rather, the Agreement provided that Kenner would keep all information submitted to it confidential, and would not use that information absent further agreement between the parties. Kiscom agreed, however, that Kenner would not be liable if it independently developed a similar idea, or the idea was disclosed to a third party without restriction. It cannot be said that such terms were beyond the reasonable expectations of the parties. Moreover, on its face, the Agreement is not "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824, 828 (1988) (citations omitted). Accordingly, the Court finds that the Confidentiality Agreement is not an unenforceable contract of adhesion.

AEB next contends that the Confidentiality Agreement does not apply to the current dispute, as the Agreement governed the de-

fendant's obligations only for two years following the November 1988 meeting. As the November 1988 meeting took place three years before the Colorblaster toy appeared at the Toy Fair, AEB argues that the Confidentiality Agreement expired before its causes of action arose. The Court finds this argument unpersuasive.

While the Confidentiality Agreement provides that the defendant's obligation "shall extend ... for two (2) years from the date of initial disclosure," *see* the Confidentiality Agreement at ¶ 11, the Agreement provides further that its terms "shall be in perpetuity unless modified or terminated as specified herein." *Id.* Thus, the Confidentiality Agreement did not expire at the end of the two-year period. Rather, Kenner's obligation to keep information about the Jet Art submission confidential lapsed after two years from the date that the submission was presented to it. Accordingly, AEB's argument that the Confidentiality Agreement ceased to govern the Jet Art submission in November 1990 lacks merit.

 AEB contends further that the Confidentiality Agreement does not apply because Kenner abandoned it. Specifically, AEB argues that Kenner ignored paragraph six of the Agreement, which required Kiscom to warrant that it did not represent a third party having a claim to any items submitted to Kenner. In addition, Kenner failed to enforce the procedures set forth in paragraph one for recording items presented to it.

 "A mutual agreement to abandon a contract discharges any obligations under the contract and renders the contract unenforceable." *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.,* 807 F.Supp. 1007, 1021 (S.D.N.Y.1992). To establish that a party abandoned a contract, however, it must be shown that the party's conduct was mutual, positive, unequivocal, and inconsistent with

an intent to be bound by the contract's terms. *See Rosiny v. Schmidt,* 185 A.D.2d 727, 587 N.Y.S.2d 929, 932 (1st Dep't 1992); *Staebell v. Bennie,* 83 A.D.2d 765, 443 N.Y.S.2d 487, 488 (4th Dep't 1981) (finding that a contract is not abandoned unless there is a repudiation of it and a refusal to perform). "The party who asserts abandonment has the burden of establishing it since the termination of a contract is not presumed." *Rosiny v. Schmidt,* 587 N.Y.S.2d at 932; *see also United States v. International Bhd. of Teamsters,* 816 F.Supp. 864, 870–71 (S.D.N.Y.1992). In addition, the mere fact that a party breaches its agreement with another is insufficient to establish abandonment. *See Carver v. Apple Rubber Prods. Corp.,* 163 A.D.2d 849, 558 N.Y.S.2d 379, 380 (4th Dep't 1990).

In the case at hand, it is clear that Kenner did not intend to abandon the Confidentiality Agreement. Thus, while Kenner failed to enforce certain provisions of the Agreement relating to documentation and warranty, Kenner's conduct cannot be considered "mutual, positive, unequivocal, and inconsistent with the intent to be bound." *Rosiny v. Schmidt,* 587 N.Y.S.2d at 932. Accordingly, AEB's argument that Kenner abandoned the Confidentiality Agreement lacks merit, and the Court finds that AEB's implied contract and unjust enrichment claims are precluded by the existence of the Confidentiality Agreement.

## C. Misappropriation Claim

Tonka next moves for summary judgment on AEB's claim that Kenner misappropriated the Jet Art idea. According to Tonka, AEB's third cause of action fails because (1) the Jet Art concept is not novel; and (2) Kenner independently developed the Colorblaster toy.[7] The Court agrees.

### 1. Novelty

 A plaintiff asserting misappropriation of his idea must establish that his con-

---

7. Tonka also argues that AEB's misappropriation claim fails, as the Jet Art submission is not a trade secret. While the Court agrees that a product idea is not a protectible trade secret, *see Hudson Hotels Corp. v. Choice Hotels Int'l,* 995 F.2d 1173, 1176 (2d Cir.1993), AEB has not pleaded misappropriation of a trade secret, but

merely that Kenner misappropriated its idea. *See Lehman v. Dow Jones & Co.,* 783 F.2d 285, 299 (2d Cir.1986) ("A cause of action may arise with respect to information that does not qualify as a trade secret if the information is disclosed in confidence and later used in a manner that breaches the confidence.").

cept is sufficiently novel to be entitled to legal protection. *See Kavanau v. Courtroom Television Network,* 91 Civ. 7959, 1992 WL 197430, at *4, 1992 U.S.Dist. LEXIS 11472, at *11 (S.D.N.Y. Aug. 3, 1992); *Robert Brian Assocs., Inc. v. Munsingwear, Inc.,* 74 Civ. 4648, slip op. at 3 (S.D.N.Y. May 17, 1978). Thus, "when one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based on these two elements." *Downey v. General Foods Corp.,* 31 N.Y.2d 56, 334 N.Y.S.2d 874, 877, 286 N.E.2d 257, 259 (1972); *see also Bram v. Dannon Milk Prods., Inc.,* 33 A.D.2d 1010, 307 N.Y.S.2d 571 (1st Dep't 1970) ("Lack of novelty in an idea is fatal to any cause of action for its unlawful use."); *Ed Graham Prods., Inc. v. National Broadcasting Co.,* 75 Misc.2d 334, 347 N.Y.S.2d 766, 769 (Sup.Ct.N.Y.Co.1973) (same). Whether an idea is novel is an issue of law which may properly be decided on a motion for summary judgment. *Kavanau v. Courtroom Television Network,* 1992 WL 197430, at *4, 1992 U.S.Dist. LEXIS at *12; *Paul v. Haley,* 183 A.D.2d 44, 588 N.Y.S.2d 897, 903 (2d Dep't 1992). In establishing an idea's originality, a plaintiff cannot rest on mere assertions, but must demonstrate some basis in fact for its claims. *See Women Golfer, Inc. v. Meredith Corp.,* 792 F.Supp. 211, 214 (S.D.N.Y.1992).

▬ To establish novelty, a plaintiff's idea "need not reflect the 'flash of genius,' but it must show[ ] genuine novelty and invention, and not a merely clever or useful adaptation of existing knowledge." *Educational Sales Programs, Inc. v. Dreyfus Corp.,* 65 Misc.2d 412, 317 N.Y.S.2d 840, 844 (Sup.Ct.N.Y.Co.1970). While even original ideas combine elements that are themselves not novel, novelty cannot be found where the idea consists of nothing more than a variation on a basic theme. *Murray v. National Broadcasting Co.,* 844 F.2d 988, 993 (2d Cir. 1988), *cert. denied,* 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988). In addition, a plaintiff may not claim that an idea is original if it was already in use in the industry at the time of the submission. *McGhan v. Ebersol,* 608 F.Supp. 277, 286 (S.D.N.Y.1985).

▬ In this case, AEB concedes that the Jet Art prototype was based on the design for commercial airbrush tools. It argues, however, that the mechanism for hand pumping air into a canister to build pressure for continuous air flow makes the Jet Art toy a novel concept. In response, Tonka contends that both the "Spray and Play" toy and the "Junior Airbrush" submission consist of manually-operated airbrush systems. While neither the "Spray and Play" toy nor the "Junior Airbrush" prototype utilize a system of hand pumping air into a canister to build air pressure, the Court finds that, in light of these similar designs for airbrush toys, the Jet Art idea consists of nothing more than a "clever or useful adaptation of existing knowledge." *Educational Sales Programs, Inc. v. Dreyfus Corp.,* 317 N.Y.S.2d at 844. Accordingly, the requisite element of novelty is lacking.

### 2. Independent Development

▬ Even if AEB could establish that the Jet Art toy is a novel concept, however, the Court finds that it has failed to rebut Tonka's evidence of independent development. A plaintiff cannot recover for misappropriation absent a showing that its ideas were actually used by the defendant. *See Women Golfer, Inc. v. Meredith Corp.,* 792 F.Supp. at 214, n. 6. Accordingly, even where a plaintiff's concept is novel and original, "recovery will be denied where it is established that the party alleged to have misappropriated another's concept, arrived on its own initiative or by wholly independent means at a concept similar to that devised by the party seeking recovery for misappropriation." *Robert Brian Assocs., Inc. v. Munsingwear, Inc.,* slip op. at 3; *see also Wolf v. Louis Marx & Co.,* 78 Civ. 2018, slip op. at 4 (S.D.N.Y. Feb. 20, 1980); *Paul v. Haley,* 588 N.Y.S.2d at 905 (finding that a defendant may rebut a *prima facie* case of misappropriation of ideas by showing that he or she independently created the work at issue).

In the case at hand, Tonka has demonstrated that Kenner independently developed the Colorblaster toy. First, Mayer conceived of the idea for the Colorblaster toy as early

as March 1988, eight months prior to the November 1988 meeting. In addition, when Mayer developed a working model of the Colorblaster toy in the spring of 1989, he worked independently, and did not seek assistance from any individual other than Hayes, his supervisor.

Second, the Jet Art submission was presented to Bollinger in New York, and Mayer was not present at that meeting. While AEB contends that Kiscom sent the Jet Art materials to Kenner's Cincinnati office, Kenner's records indicate that the Jet Art submission was never received at the Cincinnati office. Moreover, as Mayer worked in a rival department from Bollinger, it is unlikely that Mayer spoke with Bollinger about the Jet Art idea or viewed the Jet Art submission prior to developing the Colorblaster toy.

In light of this evidence, the Court finds that plaintiff's conclusory and speculative assertions to the contrary are insufficient to avoid summary judgment. *See Downey v. General Foods Corp.,* 334 N.Y.S.2d at 878, 286 N.E.2d at 259 (finding that plaintiff's hope that he may be able to prove that defendant's witnesses lied is insufficient to defeat motion for summary judgment). Accordingly, Tonka's motion for summary judgment dismissing AEB's misappropriation claim is granted.

## II. Motion to Amend the Complaint

▪ AEB moves, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, for leave to amend its complaint to assert a cause of action for breach of contract. Tonka contends that leave should not be granted, however, as a cause of action for breach of contract will fail as a matter of law. For the reasons that follow, AEB's motion is denied.

▪ A party may amend its pleading once as a matter of right before a responsive pleading has been served, otherwise it may do so by leave of the court, and such "leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *see also Cortec*

*Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 112 S.Ct. 1561 (1992). However, where a plaintiff is unable to allege any fact sufficient to support its proposed claim, leave should be denied. *Id.; see also State of New York v. Cedar Park Concrete Corp.,* 741 F.Supp. 494, 496 (S.D.N.Y.1990) (finding that leave may be denied where the amendment would be futile).

AEB argues that Kenner breached the Confidentiality Agreement by using the Jet Art concept in designing the Colorblaster toy. As the Court has determined that the Jet Art submission is not novel, however, AEB's proposed breach of contract claim would fail. *See Apfel v. Prudential–Bache Sec. Inc.,* 600 N.Y.S.2d at 436, 616 N.E.2d at 1098 (finding that novelty establishes the value of the consideration necessary for a contract for the disclosure of ideas with payment based on use); *Bram v. Dannon Milk Prods., Inc.,* 307 N.Y.S.2d at 571 ("Lack of novelty in an idea is fatal to any cause of action for its unlawful use.").

Even if the Jet Art submission could be considered novel, however, the Court finds that the terms of the Confidentiality Agreement preclude AEB from pleading a viable cause of action for its breach. The Confidentiality Agreement provided that Kenner would not be liable for the independent creation of a toy that was similar to an outside submission. *See* the Confidentiality Agreement at ¶ 4(F). In addition, Kiscom did not have rights to ideas already known to Kenner or the public, and Kenner would not be liable if the idea had already been disclosed to a third party without restriction. *Id.* at ¶ 4(A)–(D).

As set forth, *supra,* AEB has failed to rebut Kenner's evidence that it independently developed the Colorblaster toy. Moreover, Kenner was released from liability under the Confidentiality Agreement when Kiscom presented the Jet Art submission to Fisher–Price without restriction.[8] Accord-

8. AEB argues that the Fisher–Price Agreement is unenforceable as it is a contract of adhesion. The Court notes, however, that contracts embodying the same terms as the Fisher–Price Agreement have been upheld by other courts.

*See, e.g., Kearns v. Ford Motor Co.,* 203 U.S.P.Q. 884, 1978 WL 21367 (E.D.Mich.1978) (upholding waiver where plaintiff relinquished all rights and remedies against the defendant with respect to

ingly, as the Court finds that a cause of action for breach of contract would be futile, AEB's motion to amend the complaint is denied.

## CONCLUSION

For the reasons set forth above, Tonka's motion, pursuant to Federal Rule of Civil Procedure 56(b), for summary judgment dismissing the complaint is granted. AEB's motion, pursuant to Rule 15(a), for leave to amend the complaint is denied.

SO ORDERED.

his disclosures except those provided for by the patent and copyright laws).