ROBERT S. NUSINOV, INC., and Robert S. Nusinov, Individually, Plaintiff,

v.

The PRINCIPAL MUTUAL LIFE INSURANCE COMPANY and the Principal Financial Group, Defendants.

No. 96–CV–0694H.

United States District Court, W.D. New York.

Jan. 3, 2000.

Frank T. Gaglione, Saperston & Day, Buffalo, NY, for Robert S. Nusinov, Inc., Robert S. Nusinov.

Kevin M. Kearney, Neal Anthony Murphy, Diane H. Nowak, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Principal Mut. Life Ins. Co.

Kevin M. Kearney, Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, for Principal Financial Group.

## DECISION AND ORDER

HECKMAN, United States Magistrate Judge.

The parties have consented to have the undersigned conduct all further proceedings in this case, including entry of judgment after trial, in accordance with 28 U.S.C. § 636(c). The record before the court on liability consists of a joint stipulation of facts and documentary evidence. The damages issues were tried before the court on October 12 and 13, 1999. What follows are court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### FINDINGS OF FACT

This case was originally filed in August, 1996, in New York State Supreme Court. It was removed to this court on the basis of diversity of citizenship. Plaintiffs are Robert S. Nusinov, Inc. (a wholesale fruit distributor), and Robert S. Nusinov, individually. Defendants are the Principal Financial Group, and its affiliate the Principal Mutual Life Insurance Company (collectively, "The Principal").

On October 4, 1999, the parties entered into a "Stipulation of Uncontested Facts and Exhibits" (Item 18). According to the stipulation, in 1981 a predecessor of Robert S. Nusinov, Inc. (the Harry Nusinov Company), adopted a "Money Purchase Plan" (the "Plan") to provide pension benefits to participants, using a prototype plan document and "Adoption Agreement" prepared by The Principal. On October 13, 1989, Robert Nusinov (as President of Robert S. Nusinov, Inc.) executed a revised Adoption Agreement, effective January 1, 1989. The Adoption Agreement was prepared by The Principal and included the following employer contribution formula:

CONTRIBUTION FORMULAS. As of a Contribution Date, the amount we shall contribute [to the Plan] shall be equal to the following:

\* \* \* \* \* \*

INTEGRATED FORMULA. An amount equal to 20% of all [of the employee]'s Pay plus the Maximum Integration Rate of his Pay which exceeds

the Integration Level, unless a lower percentage is specified in (a) below:

a) 5%

b) The INTEGRATION LEVEL is the Taxable Wage Base (maximum wage base subject to Social Security tax) as in effect on the latest Yearly Date ....

(Item 15, Ex. 1, ¶ O).

The "Integrated Formula" used in the October 1989 Adoption Agreement was consistent with the employer contribution formula that had been used since the initial adoption of the Plan in 1981. This formula allowed Mr. Nusinov to contribute annually to the Plan up to the lesser of 20% of his compensation, or $30,000.00. Mr. Nusinov was the only participant in the Plan at that time. The same formula was used in a second Adoption Agreement, executed by Mr. Nusinov on December 31, 1989 (*id.*, Ex. 2).

On October 29, 1991, The Principal sent Mr. Nusinov a letter explaining that a third revised Adoption Agreement was necessary in order to reflect amendments to the Internal Revenue Code established by the Tax Reform Act of 1986. The October 29, 1991 letter was signed by Assistant Administrative Specialist Jane Pederson, and stated as follows:

> [T]o bring your plan into compliance [with the changes to the Tax Code] you need to review and sign a new plan document.... We completed the enclosed Adoption Agreement draft based on your prior plan provisions. We recommend that you review this draft carefully and involve your legal advisor to ensure it meets your needs. Neither [The Principal] nor your representative is responsible for any legal or tax implications of a plan change.

(Item 15, Ex. 3). Mr. Nusinov had not requested or authorized The Principal to make any changes to the Plan's contribution formula at the time he received the third revised Adoption Agreement. Mr. Nusinov executed the third revised Adoption Agreement on November 4, 1991.

Ms. Pedersen's statement that the draft third Adoption Agreement was based on prior Plan provisions was not entirely correct. The Principal had redrafted provisions of Paragraph O of the third Adoption Agreement to read as follows:

CONTRIBUTION FORMULAS. As of a Contribution Date, the amount we shall contribute for a person meeting the requirements in Item N shall be equal to the following:

\*      \*      \*      \*      \*      \*

INTEGRATED FORMULA. An amount equal to

a) 20% of [the employee's] Pay not in excess of his Integration Level, plus a percentage of his Pay in excess of the Integration Level. The second percentage shall be equal to

b) a percentage equal to the lesser of

   i) 2 times the percentage in (a) above or

   ii) the sum of the Maximum Integration Rate and the percentage in (a) above

unless otherwise specified in (c) below

c) The second percentage shall be equal to 5%. (If this percentage exceeds the percentage in (b) above, the percentage in (b) above shall apply).

(Item 15, Ex. 4, ¶ O). Although setting forth the same percentages on the blank lines of Paragraph O, the third Adoption Agreement changed the Integrated Formula by substituting the words *"Pay not in excess of his Integration Level"* for the words *"all such person's Pay."* This change had the effect of reducing Mr. Nusinov's contributions on behalf of participants in the Plan since it capped the base contribution percentage at the "Integration Level" rather than all of the employee's pay. The Principal's letter to Mr. Nusinov failed to note this inconsistency.

The Tax Reform Act of 1986 added a new subsection to the Tax Code, Section 401(*l*). This section set forth new statutory guidelines to be followed by qualified

plans, like the Nusinov Plan, using "integrated contribution" formulas. The Principal's changes to the substantive provisions of paragraph O of the third revised Adoption Agreement parallels the provisions of Section 401(i), which uses the terms "Base Contribution Percentage" and "Excess Contribution Percentage." The provisions of the Tax Reform Act of 1986, however, did not reduce the maximum amount of $30,000 which could be added annually to a participant's account. In order to maintain the same level of contributions on behalf of Mr. Nusinov, the new Adoption Agreement could have been drafted by using a nonintegrated formula equal to 25% of all pay.

It is uncontested that in May 1993 The Principal mailed and Mr. Nusinov received a fourth revised Adoption Agreement (IRS Serial No. D247612B, approved October 26, 1992) for Mr. Nusinov's signature. The fourth Adoption Agreement prepared by The Principal restated the incorrect contribution formula set forth in the third Adoption Agreement (see Item 15, Ex. 5, ¶ O). It is also uncontested that on November 18, 1994, The Principal sent and Mr. Nusinov received a letter stating that The Principal had sent Mr. Nusinov an Adoption Agreement in May 1993 which he was required to review and sign by December 31, 1994. On November 28, 1994, Mr. Nusinov executed the fourth Adoption Agreement.

For each of the 1991, 1992 and 1993 calendar Plan years, Mr. Nusinov continued to contribute to the Plan based on the original contribution formula providing for a 20% contribution of all employee's pay and 5% in excess of the Integration Level. The Principal continued to prepare IRS Forms 5500 for Mr. Nusinov's review, signature and filing, reflecting a maximum contribution to the Plan of $30,000 each year based on the information Mr. Nusinov provided.

In or about February 1995, The Principal became aware of the reduced contribution formula set forth in the third and fourth Adoption Agreements. Based on its review of the facts, The Principal recommended in a letter to Mr. Nusinov dated April 28, 1995, that Mr. Nusinov file a request with the Internal Revenue Service ("IRS") pursuant to the Voluntary Compliance Resolution ("VCR") program (Revenue Procedure 92–89), amending the Plan effective January 1, 1994, to revise the contribution formula. The Principal also offered to prepare a sample VCR filing, pay the $500 IRS filing fee for submitting a VCR request, and waive annual contract expenses for the Plan for 1995 and 1996 if Mr. Nusinov followed The Principal's recommendations (see Item 15, Ex. 10).

Mr. Nusinov retained Charles G. Humphrey, Esq., to prepare the VCR, which was filed with the IRS in November 1995. According to the calculations set forth in the VCR, over the three-year period from 1991 through 1993, Nusinov, Inc. made excess contributions to the Plan in the total amount of $41,380.00, requiring the payment of excise taxes totaling $13,553.00 (Item 15, Ex. 12). In addition, on March 14, 1995, Mr. Nusinov executed a fifth Adoption Agreement revising the contribution formula to provide for a non-integrated contribution of 25% of his pay, effective January 1, 1994 (id., Ex. 13).

On February 27, 1996, prior to the IRS's acceptance of the VCR proposal, Pension Administrator Jamie Lindell sent a letter to plaintiffs' counsel stating as follows:

We fully agree that an employee of The Principal Financial Group made an error when completing the integration contribution portion of Mr. Nusinov's "TRA '86 Restatement." We apologize once again for this human error and the resulting inconvenience to Mr. Nusinov. Back in 1989 we recognized the complexity of all the changes brought about by TRA '86, so we asked Mr. Nusinov, the plan administrator, to consult with his tax or legal advisor to make sure the plan met his needs. As plan administrator, Mr. Nusinov had then and continues to have a responsibility to make sure his

plan provisions are correct. We instructed Mr. Nusinov to review the materials outlining all changes, including integration rules. We also asked him to verify the rough draft of the TRA '86 restatement, and then sign, date, and return the document to us signifying we were to complete a final draft, which he did.

At the time the IRS responds to the VCR filing, they will clearly outline what corrective action is needed for the plan to remain in compliance. Since we share in the responsibility for the plan document error, we are offering to pay 50 percent of the cost of the corrective action stipulated by the IRS in the VCR closing agreement.

(Item 15, Ex. 11).

At the trial on October 12 and 13, 1999, plaintiffs offered the testimony of Daniel Weintraub, a certified public accountant employed by the firm of BDO Seidman, LLP, and David Garver, principal actuary of Actuarial Consulting Services, Inc. ("ACSI"). Mr. Weintraub testified that he is the accountant for Robert S. Nusinov, Inc. At plaintiffs' counsel's request, he prepared a document entitled "Excess Contribution Analysis"[1] to aid in the determination of the amount of damages resulting from The Principal's error. Mr. Garver testified that, using the amounts set forth in the BDO Seidman analysis, he calculated the amount of investment income lost as a result of The Principal's error. Based on these calculations, plaintiffs seek damages in the total amount of $263,505.01 (*see* Item 25, ¶ 15 and Schedules A and B attached thereto).

Defendant offered the testimony of Joseph Ogden, Ph.D., Chair of the Finance Department at the State University of New York at Buffalo. Dr. Ogden testified that the plaintiffs' "lost investment income" theory of damages is flawed because it is based on incorrect assumptions about tax-deferred options available to Mr. Nusinov for investment of the money he was prevented from investing in the Plan. In Dr. Ogden's opinion, the proper method for calculating the damages in this case is the "incremental cash flow" method, and the only appropriate damages suffered by plaintiffs, if any, result from the need to pay income tax on $41,380.00 in 1997, rather than at his retirement. According to defendant, that amount is $8,841.00.

## CONCLUSIONS OF LAW

The only claim upon which this case was tried was breach of contract. Plaintiffs claim that The Principal breached its contractual obligation as third-party administrator of the Plan to perform accurate record keeping and prepare accurate Plan documents. Plaintiffs have not produced a written contract. Instead, plaintiffs argue that a contract should be implied from the parties' course of conduct since 1981, when The Principal first started providing services to the Harry Nusinov Company.

■ Generally, state law causes of action relating to the administration of employee benefit plans are preempted by the statutory remedies provided under the Employee Retirement Income Security Act ("ERISA"). *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Transitional Hospitals Corporation v. Blue Cross And Blue Shield of Texas, Inc.,* 164 F.3d 952, 954 (5th Cir.1999). However, the parties agree that the contract claim in this case is not preempted by ERISA because the amendment of a pension plan to comply with changes in the tax law is a ministerial—rather than fiduciary—function. *Siskind v. The Sperry Retirement Program, Unisys,* 47 F.3d 498, 505 (2d Cir.1995); *see also Izzarelli v. Rexene Prods. Co.,* 24 F.3d 1506, 1524–25 & n. 33 (5th Cir.1994); *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d

1. The "Excess Contributions Analysis" prepared by BDO Seidman is attached to Item 15 as Exhibit 19. This exhibit was submitted with plaintiffs' pretrial statement as the expert report of BDO Seidman, and was offered at trial for identification only.

1155, 1161 (3d Cir.1990) (collecting cases). The parties also agree that New York law provides the legal framework for deciding the issues presented. *See, e.g., Asian Vegetable Research v. Institute of International Education,* 944 F.Supp. 1169, 1173 (S.D.N.Y.1996) (claims against third-party administrator of retirement plan for failure to perform accurate record-keeping and accounting obligations subject to analysis under New York contract law).

█ Under New York law, in the absence of an express agreement, a contractual relationship may nonetheless be established by the conduct of the parties and the surrounding circumstances. *Mirchel v. RMJ Securities Corp.,* 205 A.D.2d 388, 390, 613 N.Y.S.2d 876, 878–79 (1st Dep't 1994); *Land–Site Contracting Corp. v. Marine Midland Bank,* 177 A.D.2d 413, 415, 576 N.Y.S.2d 255, 257 (1st Dep't 1991); 22 N.Y. JUR.2d CONTRACTS § 6 (express contracts and contracts implied-in-fact). In support of their "implied contract" argument in this case, plaintiffs have submitted copies of "Service and Maintenance" agreements used by The Principal Financial Group in connection with the administration of various employee benefit plans, which indicate that The Principal typically provides the following third-party administrative services:

  (a) Plan set-up, including design and drafting of prototype Plan documents and Adoption Agreements.

  (b) Plan record keeping services.

  (c) Compliance services, including preparation and filing of annual tax returns.

  (d) Investment services.

  (e) Participant reporting services.

  (f) Preparation of Plan amendments and Adoption Agreements relating to Plan changes and restatements.

(*see* Item 15, Ex. 21, pp. 8–10 and attachments M & N). In addition, on December 10, 1993, The Principal sent Mr. Nusinov a letter outlining the following "quality service guarantee:"

We are so sure we can provide you outstanding service, we guarantee it. Our unconditional quality service guarantee promises to serve you promptly and accurately.

If you are unhappy with any aspect of our offered services, just tell us. We promise to fix the problem to your satisfaction. If we can't we'll waive the fee paid for that service.

(Item 15, Ex. 17).

According to plaintiffs, based on the representations made in these documents and the administrative services actually provided by The Principal, Mr. Nusinov reasonably relied on The Principal to complete the third and fourth Adoption Agreements accurately and in accordance with the prior Plan documents so as to allow Mr. Nusinov to obtain the maximum deferred tax benefits from his money purchase pension plan. Plaintiffs contend that The Principal breached its duty to prepare accurate documents when it sent the erroneous third Adoption Agreement to Mr. Nusinov, representing that it was based on his prior Plan provisions. Plaintiffs further argue that this error was repeated in the fourth Adoption Agreement and in the yearly tax returns.

Defendants concede that a mistake was made, but argue that the mistake was not a breach of contract. Defendants point to language in the transmittal letter of October 29, 1991, recommending to Mr. Nusinov that he "review [the] draft carefully and involve [his] legal advisor to ensure it meets [his] needs ...," and stating that The Principal was not "responsible for any legal or tax implications of a plan change" (Item 15, Ex. 3).

Thus, the issue amounts to one of allocating responsibility for ensuring that the contribution level was correct. That requires an analysis of the scope of the contractual relationship between the parties. If there is no duty running from the defendants to the plaintiffs as to this issue,

then defendant cannot be held liable for the mistake.

Clearly, an implied contract did exist between the parties. For a number of years, The Principal performed administrative services for the plaintiffs, and the plaintiffs paid The Principal a fee for these services (*see, e.g.,* Exs. 14–18; Ex. 21, attachments M & N). The question presented is whether the terms of that implied contract include the duty not to make the type of mistake that occurred in this case.

■ Plaintiffs have the burden of proof on this issue. *Marketing Specialists, Inc. v. Bruni,* 129 F.R.D. 35, 39 (W.D.N.Y. 1989) (citing *Apex Oil Company v. Vanguard Oil & Service Co., Inc.,* 760 F.2d 417, 425 (2d Cir.1985) (Oakes, J., concurring)), *aff'd,* 923 F.2d 843 (2d Cir.1990). Although the question is admittedly a close one, I find that plaintiffs have not met this burden.

■ To prove an implied contract, plaintiffs must establish that the parties' conduct and the surrounding facts and circumstances show a mutual intent to contract and a meeting of the minds. *Jemzura v. Jemzura,* 36 N.Y.2d 496, 503–04, 369 N.Y.S.2d 400, 330 N.E.2d 414 (1975); *see also Health and Community Living, Inc. v. Goldis Fin. Group, Inc.,* 1998 WL 117928, *5 (E.D.N.Y. March 13, 1998); *AEB & Assocs. Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 731 (S.D.N.Y. 1994). With respect to the Plan amendment at issue, the cover letter accompanying the draft revised adoption agreement expressly recommended that Mr. Nusinov review the draft carefully and involve his legal advisor to make sure that his needs were met. It goes on to state that, "[n]either Principal Mutual Life Insurance Company nor your representative is responsible for any legal or tax implications of a plan change" (Item 15, Ex. 3). It made clear that the enclosed document was a draft only, and that any changes made by Mr. Nusinov would be placed in a new draft.

In addition, each of the Adoption Agreements prepared by The Principal and executed by Mr. Nusinov contained the following clause:

It is understood that [The Principal] is not a party to [the] Plan and shall not be responsible for any tax or legal aspects of [the] Plan. [The employer] assume[s] responsibility for these matters. [The employer] acknowledge[s] that [it has] counseled, to the extent necessary, with selected legal and tax advisors. The obligations of [The Principal] shall be governed solely by the provisions of its contracts and policies. [The Principal] shall not be required to look into any action taken by the Plan Administrator, Named Fiduciary, Trustee or [the employer] and shall be fully protected in taking, permitting or omitting any action on the basis of [the employer's] actions. [The Principal] shall incur no liability or responsibility for carrying out actions as directed by the Plan Administrator, Named Fiduciary, Trustee or [the employer].

(Item 15, Ex. 1, p. 10; *see also id.,* Ex. 2, p. 10; Ex. 4, p. 15; Ex. 5, p. 16).

Clearly, these statements are inconsistent with plaintiffs' burden of proving a meeting of the minds on the issue of The Principal's duty to ensure that the contribution level was correct. These statements plainly place on the plaintiffs the responsibility to read the draft, review it with legal advisors, make changes as necessary, and execute the final document. "A contract cannot be implied in fact where the facts are inconsistent with its existence, or against the declaration of the party to be charged ...." *Miller v. Schloss,* 218 N.Y. 400, 406, 113 N.E. 337 (1916), quoted in *Ellis v. Provident Life & Accident Ins. Co.,* 3 F.Supp.2d 399, 412 (S.D.N.Y.1998), *aff'd,* 172 F.3d 37, 1999 WL 55317 (3d Cir.1999). Furthermore, ERISA imposes an obligation on the employer as plan administrator to make decisions concerning contribution levels and to ensure that the plan documents meet the

needs of the plan beneficiaries. *See, e.g.*, 29 U.S.C. § 1002(21)(A) (defining "fiduciary"); 29 U.S.C. § 1104(a)(1) (describing duties of fiduciary); 29 C.F.R. § 2509.75-8 (plan administrator or trustee generally considered to be "fiduciary" within the meaning of ERISA); *see also Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 122 (2d Cir.1997) (ERISA imposes fiduciary duty on employers administering retirement plans to act "solely in the interest of the participants and beneficiaries").

The only real argument for shifting this responsibility to the defendant is the language in the cover letter which states, "[w]e completed the enclosed Adoption Agreement draft based on your prior plan provisions" (Item 15, Ex. 3). This certainly implies that the contribution level would remain the same. However, the very next two sentences state:

> We recommend you review this draft carefully and involve your legal advisor to ensure it meets your needs. Neither [The Principal] nor your representative is responsible for any legal or tax implications of a plan change.

(id.). Accordingly, while portions of the letter read in isolation may support the existence of an implied contract to ensure that the contribution level was correctly modified, the letter read as a whole places on Mr. Nusinov the responsibility to ensure that the modification was accurate and in accordance with the plaintiffs' wishes.

The holding in *Asian Vegetable Research and Development Center v. Institute of International Education, supra,* the only legal authority cited by plaintiffs in support of their "implied contract" argument, does not dictate a different result. The *Asian Vegetable* case involved interpretation of the language contained in an express agreement between the plaintiff/employer and the third-party administrator of an employee benefits plan. The plaintiff claimed that the plan administrator breached certain duties specified in the agreement, and moved for summary judg-

ment on the ground that it had established the breach. The administrator also moved for summary judgment, claiming that it had performed all of its obligations under the agreement. The court denied both motions, finding ambiguity in the contract language with respect to the scope of the third-party administrator's obligations. *Id.*, 944 F.Supp. at 1174-75. There is nothing in the *Asian Vegetable* decision, or in any other case cited by the parties or researched by the court, to support a finding that a third-party administrator of an employee retirement plan has a duty as a matter of law to ensure the correctness of the plan's contribution formula at the risk of liability for lost investment opportunities.

In addition, as discussed above, there is no express language in the documents produced by the parties imposing a duty on The Principal to ensure that the contribution formula was correct. Indeed, the actual language in the Plan documents and the course of conduct between the parties suggests that the parties intended that duty to be borne by Mr. Nusinov.

Because the court finds that plaintiffs have failed to meet the burden of proof establishing liability by a preponderance of the evidence, it is unnecessary to address the issue of damages.

### CONCLUSION

For the reasons set forth above, judgment will be entered in favor of the defendant.

SO ORDERED.