**ASIAN VEGETABLE RESEARCH AND DEVELOPMENT CENTER, et al.,**
Plaintiffs,

v.

**INSTITUTE OF INTERNATIONAL EDUCATION, Defendant.**

No. 94 Civ. 6551 (RWS).

United States District Court,
S.D. New York.

Oct. 31, 1996.

Tashjian & Padian (Richard G. Tashjian, of counsel), New York City and Ginsburg, Feldman and Bress (Eugene M. Propper, of counsel), Washington, DC, for Plaintiffs.

Jackson, Lewis, Schnitzler & Krupman (James R. Williams, Michael Jacobster, of counsel), New York City, for Defendant.

## *OPINION*

SWEET, District Judge.

Plaintiffs Asian Vegetable Research and Development Center, et. al ("the Centers") have moved pursuant to Federal Rules of Civil Procedure 56 for summary judgment on their claims for breach of contract and fiduciary duty, and Defendant Institute of International Education ("IIE") has moved pursuant to Federal Rules of Civil Procedure 56 for summary judgment to dismiss each of the Centers' claims.

For the reasons set forth below, the Centers' motion will be granted in part and denied in part and IIE's cross-motion will be denied in part and granted in part.

### *The Parties*

The parties and prior proceedings are described in two earlier opinions of this Court, familiarity with which is assumed. *See Asian Vegetable v. Institute of International Education,* 1995 WL 491491 (S.D.N.Y. August 17, 1995) (the "1995 Opinion"); *Asian Vegetable v. Institute of International Education,* 1996 WL 14448 (S.D.N.Y. January 16, 1996) (the "January Opinion"). The parties

and prior proceedings are repeated below only insofar as they relate to this motion.

The Centers are agricultural and/or scientific research organizations with headquarters in cities around the world.

IIE is a non-profit New York corporation which develops and administers programs for various international organizations, corporations, foundations and universities, and which provides administrative and purchasing services to universities, foreign countries and agricultural research centers. It provided personnel, payroll, insurance and other administrative services to the Centers, including services with respect to a retirement plan maintained by the Centers for their non-U.S. personnel (the "Offshore Plan").

### Prior Proceedings

The Centers filed the complaint in this action on September 12, 1994 alleging breach of contract, negligence, gross negligence, breach of fiduciary duty, malpractice, concealment, negligent misrepresentation, and intentional misrepresentation and seeking compensatory and punitive damages, interest, attorneys' fees and costs.

In the 1995 Opinion, the Court held that the fiduciary exception to the attorney client privilege did not apply to letters between IIE and its counsel after December 1992, when the relationship between IIE and the Centers was terminated; the Centers were not entitled to those documents under the fiduciary exception.

By Opinion dated January 16, 1996, the Court denied the Centers' motion to compel production of documents, and granted IIE's cross-motion for a protective order. The January Opinion addresses the applicability of the fiduciary duty exception to privileged communications between IIE and its counsel prior to the termination of the contractual relationship between the parties.

That Opinion held:

Under the Cooperation Agreements, the single relationship is between IIE and the Contracting Centers. The language of the Contract is not directly between IIE and any employee of a Center or even between IIE and the Offshore Plan. Plaintiffs draw on and this Opinion has described the fiduciary duty between Plan administrators and Plan beneficiaries, but that is not the relationship described by the contracts at issue here.

Section 3.1 of the Plans makes it clear that IIE is not a fiduciary to the Offshore Plan because it has no relationship to the Offshore Plan or its beneficiaries. The Second Restatement of Torts explains that "a person in a fiduciary relation to another is under the duty to act for the benefit of the other as to matters within the scope of the relation." Here the contract negotiated by two large sophisticated parties clearly defined the relationship.

*Asian Vegetable,* 1996 WL at *6.

On July 31, 1996, IIE and the Centers filed the instant motions for summary judgment. The Centers move for summary judgment with respect to their claims for breach of contract and breach of fiduciary duty. IIE moves for summary judgment to dismiss the Centers' claim for breach of contract, breach of fiduciary duty, negligence, gross negligence, malpractice and fraud. Oral argument on the motions was heard on September 11, 1996, at which time the motions were considered fully submitted.

### Facts

Beginning in approximately 1985, the Centers retained IIE, an outside contractor, to administer their employee benefits plan. Pursuant to a series of Cooperation Agreements For Personnel Services (the "Cooperation Agreements" or the "Agreements") among the parties, the Centers retained IIE to provide various personnel, payroll, insurance and other administrative services, including the maintenance of a retirement plan for the benefit of the Centers' non-United States personnel (the "Offshore Plan").

The "Offshore Plan" is a fully vested, defined contribution plan in which each eligible Center employee chooses among investment options. Several provisions of the Cooperation Agreements address IIE's duties with respect to administration of the Offshore Plan.

Section 1.3 of the Agreements provides:

1.3 *Financial Accounting and Reporting:* IIE shall keep adequate books and records and shall maintain segregated records for all property, to include funds held by it on behalf of the Sponsor.

IIE's record-keeping duties with respect to the pension plan were enumerated more specifically in Exhibit 1 to the Cooperation Agreements, which states that IIE was responsible for:

maintenance of employee/employer and additional voluntary contribution records for pension plans, and of all necessary related records to facilitate changes in beneficiaries, allocations between funds, withdrawals and other changes; issuance of annual benefits statements to employees.

IIE's role as an "intermediary" between the Centers and those organizations necessary for the operation of the Offshore Plan was expressed as follows:

2.1(c) *TIAA/CREF, MONY, Generali & Alliance Retirement Plans:* IIE, as Agent, in the name of and for the account of the Sponsor, will act as an intermediary between the Sponsor and the TIAA/CREF, MONY, Generali and Alliance Retirement Plans. IIE's responsibilities include the payment of employer contributions, and other related services as described in Exhibit 1. Nothing in this Section 2.1 shall cause IIE to be a fiduciary with respect to the TIAA/CREF, MONY, Generali and Alliance Retirement Plans.

The Centers assert that they executed the Cooperation Agreement in reliance upon IIE's representations that it possessed the knowledge and expertise to administer the Offshore Plan. Beginning in the 1989–1990 Cooperation Agreements, the Agreements contained a "fiduciary duty disclaimer" clause (or "Section 3.1"). That clause reads:

Nothing in this Section ... shall cause IIE to be a fiduciary with respect to ... [the] Retirement Plans.

This clause did not appear in the Cooperation Agreements prior to 1989, and appears in all but the "ISNAR" Agreement with IIE after 1989.

Additionally, the Cooperation Agreements contained a clause that reads:

Under the terms of this Agreement, IIE shall act as representative of [a Center] only with respect to the acts covered in this agreement and nothing contained herein is intended or shall be construed to create an employer-employee relationship between IIE and individuals on the staff of [a Center]. Nothing contained in this Agreement shall be interpreted as giving any ... employee or any beneficiary ... rights of action or suits at law or in equity of whatever kind or nature against IIE for compensation or any other benefit arising under his employment or other association with the [Center].

The Cooperation Agreements include an indemnification clause, section 3.2, which provides:

*Indemnification:* The [Centers] shall pay and shall protect, indemnify and save harmless IIE and its officers, employees and agents from and against any and all losses, liabilities (including liabilities for penalties), actions, suits, judgments, demands, damages, costs and expenses (including without limitation, attorneys' fees and expenses) of any nature arising from or relating to the performance of the services contemplated under this Agreement, including any claim brought by an employee of the [Centers] or the employee's heirs, beneficiaries or representatives regarding this agreement or the Letter Agreement between IIE and the employee entered into in the form attached hereto, except to the extent that any such loss, liability, action, suit, judgment, demand, damage, cost or expense has been determined by a final judgment of a court of competent jurisdiction to be the result of the gross negligence or willful misconduct of IIE, its officers, employees or agents, IIE assumes no responsibility with respect to any action or duty required by this Agreement on the part of the [Centers].

Section 1.5(g) requires that, upon termination of the Agreements:

The [Centers] shall fully release and discharge IIE by an instrument in writing within 60 days following the termination

date. Upon such discharge, IIE shall, to the maximum extent permitted by applicable law, be forever released and discharged from all liability and accountability with respect to the propriety of its acts and transactions undertaken within the provisions of this Agreement.

In 1992, the Centers began to suspect that IIE had materially breached its duties to administer the Offshore Plan. In particular, Plaintiffs assert that IIE had failed to reconcile the contributions and withdrawals made by Center employees, payments to service providers, and the investment performance to individual employee statements. Plaintiffs allege that IIE knew of these and other major control problems in IIE's operation and administration of the Offshore Plan but IIE had nevertheless failed to correct them. Plaintiffs assert that IIE knew about deficiencies in its operation and control of the Offshore Plan at least as far back as 1986 and had not corrected those deficiencies.

In December of 1992, claiming dissatisfaction with the Institute's prices and services under the Cooperation Agreements, the Centers terminated their contractual relationship with the Institute and assumed responsibility for various of the payroll and personnel services the Institute had performed under the Cooperation Agreements, including administration of the Offshore Plan. On September 12, 1994, the Centers commenced this action against the Institute, asserting claims for breach of contract, negligence, malpractice, misrepresentation and breach of fiduciary duty.

***Discussion***

## I. *Breach of Contract*

Both parties have moved for summary judgment with respect to the Centers' claim for breach of contract. IIE argues that under the unambiguous terms of the Cooperation Agreements, its role was to act as an "intermediary" between the Centers and the organizations necessary for the Offshore Plan's operations, and it had no obligation to perform accounting functions or reconciliations of the Offshore Plan. IIE claims to have demonstrated that it has performed all of its obligations under the Agreements—*i.e.,*

the maintenance of records adequate to enable the Offshore Plan to communicate with and provide information to Plan participants and provide the record-keeper (AccuRecord) with the proper contribution amounts. IIE further argues that the Cooperation Agreements included an indemnification clause that requires the Centers to indemnify IIE against all losses and liabilities arising from IIE's duties under the Agreements, absent a showing that IIE committed gross negligence or willful misconduct. Finally, IIE argues that the Centers' claim for breach of contract is barred in part by the 6–year statute of limitations applicable to claims for breach of contract.

The Centers argue that summary judgment is warranted in their favor, as the unambiguous terms of the Cooperation Agreements require IIE to "keep adequate books and records," including full recordkeeping and accounting functions for the Offshore Plan, maintenance of detailed individual participant records and reconciliations of participant accounts to Plan assets. The Centers claim to have established that IIE breached those duties. Further, the Centers argue that the indemnification clauses were not intended to allow IIE to breach their contractual duties with impunity and be indemnified by the Centers for breaches of duty to the Centers; rather, the clauses were intended to indemnify IIE against claims by plan participants. Finally, the Centers argue that the majority of the breaches they allege occurred after 1988 and are not barred by the statute of limitations, and that, in any event, because the alleged breaches are continuing in nature, even those occurring before 1988 are not barred.

### A. *Questions of Fact Remain Regarding IIE's Obligations Under the Agreement*

■ Several provisions of the Cooperation Agreements address IIE's duties with respect to administration of the Offshore Plan. Section 1.3 of the Agreements provides:

1.3 *Financial Accounting and Reporting:* IIE shall keep adequate books and records and shall maintain segregated rec-

ords for all property, to include funds held by it on behalf of the Sponsor.

IIE's record-keeping duties with respect to the pension plan were enumerated more specifically in Exhibit 1 to the Cooperation Agreements, which states that IIE was responsible for:

maintenance of employee/employer and additional voluntary contribution records for pension plans, and of all necessary related records to facilitate changes in beneficiaries, allocations between funds, withdrawals and other changes; issuance of annual benefits statements to employees.

IIE's role as an "intermediary" between the Centers and those organizations necessary for the operation of the Offshore Plan was expressed as follows:

2.1(c) *TIAA/CREF, MONY, Generali & Alliance Retirement Plans:* IIE, as Agent, in the name of and for the account of the Sponsor, will act as an intermediary between the Sponsor and the TIAA/CREF, MONY, Generali and Alliance Retirement Plans. IIE's responsibilities include the payment of employer contributions, and other related services as described in Exhibit 1. Nothing in this Section 2.1 shall cause IIE to be a fiduciary with respect to the TIAA/CREF, MONY, Generali and Alliance Retirement Plans.

(Ex. 6).

The differing interpretation of these clauses is the central issue of this action. Each party has submitted substantial evidence of its interpretation of IIE's obligations under the Cooperation Agreements. Summary judgment is inappropriate where, as here, contract language is subject to varying reasonable interpretations. *See Thompson v. Gjivoje,* 896 F.2d 716, 721 (2d Cir.1990). Because numerous issues of fact remain regarding the scope of IIE's obligations under the Agreements, and whether IIE in fact fulfilled those obligations, both parties' motions for summary judgment on the Centers' breach of contract claim will be denied.

In support of its interpretation of the contract, IIE has presented evidence that, in light of IIE's historical role in the Offshore Plan, the requirement that IIE keep "adequate books and records" refers only to IIE's limited obligations to keep records of specific records, such as beneficiary changes and fund transfers. IIE has also submitted evidence that its role as "intermediary" only required it to hire other entities to perform detailed individual record keeping and to perform reconciliations for the various plans encompassed by the Offshore Plan, but IIE was not required to carry out these functions itself.

Additionally, IIE submits evidence that its ministerial functions were limited to allocating employee contributions as directed by the employee; sending information to the record-keeper; processing requests for withdrawals; receiving monthly statements from the record-keeper; distributing account statements to individuals. Independent accounting firms, including Coopers & Lybrand and KPMG Peat Marwick, determined that IIE did not have broad obligations to keep detailed accounts of individual participants investment records. Finally, IIE has submitted evidence that AccuRecord, not, IIE was the plan record-keeper with full responsibilities for keeping detailed records.

The Centers have likewise submitted substantial evidence in support of their position that IIE was obligated under the Agreements to keep detailed records of individual plan participants' accounts, and to perform reconciliations for the Offshore Plan as a whole. In addition to the requirement that IIE keep "adequate books and records," the Centers have submitted expert testimony, including that of IIE's expert, that IIE was required to keep records of the amounts paid out by the Plan to individual participants, and that, at a minimum, IIE was required to closely supervise AccuRecord's work and ensure that any errors made were documented and corrected.

Additionally, the Centers have submitted documentary evidence—including internal IIE documents produced to the Centers during discovery—that IIE's own understanding of its duties was that IIE was required to keep more careful records than it did; such evidence would support an inference that

regardless of the scope of IIE's obligations, it breached those obligations.

In sum, summary judgment for either party is inappropriate in light of the ambiguity regarding the meaning of the Cooperation Agreements, and the varying reasonable interpretations as to which contradictory evidence has been submitted. *See Thompson,* 896 F.2d at 721 (2d Cir.1990); *Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir.1988) (where contract language is ambiguous and subject to varying reasonable interpretations, intent is an issue and summary judgment is inappropriate). Accordingly, both parties motions for summary judgment will be denied with respect to the Centers' contract claims.

**B. *A Question of Fact Remains as to the Scope of the Indemnification Clauses***

■ Section 3.2 of the Cooperation Agreements provides:

*Indemnification:* The [Centers] shall pay and shall protect, indemnify and save harmless IIE and its officers, employees and agents from and against any and all losses, liabilities (including liabilities for penalties), actions, suits, judgments, demands, damages, costs and expenses (including without limitation, attorneys' fees and expenses) of any nature arising from or relating to the performance of the services contemplated under this Agreement, including any claim brought by an employee of the [Centers] or the employee's heirs, beneficiaries or representatives regarding this agreement or the Letter Agreement between IIE and the employee entered into in the form attached hereto, except to the extent that any such loss, liability, action, suit, judgment, demand, damage, cost or expense has been determined by a final judgment of a court of competent jurisdiction to be the result of the gross negligence or willful misconduct of IIE, its officers, employees or agents, IIE assumes no responsibility with respect to any action or duty required by this Agreement on the part of the [Centers].

Section 1.5(g) requires that, upon termination of the Agreements:

The [Centers] shall fully release and discharge IIE by an instrument in writing within 60 days following the termination date. Upon such discharge, IIE shall, to the maximum extent permitted by applicable law, be forever released and discharged from all liability and accountability with respect to the propriety of its acts and transactions undertaken within the provisions of this Agreement.

According to IIE, the indemnification clauses unambiguously require that, even if IIE is found liable for breach of contract, the Centers must indemnify IIE for the damages resulting therefrom, as no gross negligence or willful misconduct can be demonstrated. IIE points to authority holding that unambiguous contractual clauses absolving a party for liability for its own negligence are enforceable in New York. *See Colnaghi, U.S.A., Ltd. v. Jewelers Protection Servs, Ltd.,* 81 N.Y.2d 821, 823, 595 N.Y.S.2d 381, 611 N.E.2d 282 (1993); *Sommer v. Federal Signal Corporation,* 79 N.Y.2d 540, 553, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992) ("Absent a statute or public policy to the contrary, a contractual provision absolving a party from its own negligence will be enforced").

As IIE notes, the clause is written generally to require indemnification for "any and all losses [and] liabilities ... of any nature arising from or relating to the performance of the services contemplated under this Agreement." Nonetheless, in the absence of explicit language in the indemnification clauses indicating that the parties intended to allow IIE to be indemnified for its own negligence even in a suit brought by the Centers—rather than a third party—New York law does not allow the general clause to be read to allow such indemnification. *See* 23 N.Y.Jur.2d *Contribution,* § 55 at 93 ("language which is too general will be deemed insufficient to indemnify a party against his own negligence.")

In *Hooper Associates, Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 549 N.Y.S.2d 365, 548 N.E.2d 903 (1989), which involved pre-

cisely the issue presented here,[1] the Court of Appeals held that the parties had "failed to define the scope of defendant's promise." The court, in analyzing whether the clause was limited to indemnification for third party claims, or included suits between the parties, held:

> when a party is under no legal (*i.e.*, excontractu) duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed. [Citations omitted]. The promise should not be found unless it can be clearly implied from the language and purpose of the entire agreement and the surrounding facts and circumstances.

The Court denied Plaintiff's claim for attorney's fees, ruling that:

> The clause in this agreement does not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant. On the contrary, it is typical of those which contemplate reimbursement when the indemnitee is required to pay damages on a third party claim ... All these subjects [including, in particular, "the performance of any service to be performed"] are susceptible to third-party claims for failures in the installation or operation of the system. None are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract.

Similarly, in *Niagara Frontier Transportation Authority v. Tri–Delta Construction Corp.*, 107 A.D.2d 450, 487 N.Y.S.2d 428 (4th Dept.1985), *aff'd* 65 N.Y.2d 1038, 494 N.Y.S.2d 695, 484 N.E.2d 1047 (1985),

> It is well settled that the "law frowns upon contracts intended to exculpate a party from the consequences of his own negligence" ... thus, a clause will not be held

to insulate a party from liability for his own negligence unless such intention is expressed in unequivocal terms. [Citation omitted]. Where, as here, the indemnification agreement has been "negotiated at arm's length between sophisticated business entities," the intent being to allocate "the risk of liability to third parties between themselves, essentially through the employment of insurance," the rule has been somewhat liberalized ... the language of an indemnity provision should be construed so as to encompass *only* that loss and damage which reasonably appear to have been the intent of the parties. It should not be extended to include damages which are neither expressly within its terms nor of such character that it is reasonable to infer that they were intended to be covered under the contract.

*See also, e.g., Facilities Development Corp. v. Miletta*, 180 A.D.2d 97, 584 N.Y.S.2d 491 (3rd Dept.1992) ("The indemnity clause at issue does not clearly connote an intent to provide for the indemnification of plaintiff's representative for damages caused by the representative's own tortious conduct and/or breach of contract"); *Morgan v. Good Humor Corp.*, 54 A.D.2d 560, 386 N.Y.S.2d 888 (2d Dept. 1976) ("The long-established rule in New York is that 'contracts will not be construed to indemnify a person against his own negligence unless such intention is expressed in unequivocal terms' ").

In connection with IIE's role of providing medical and life insurance, paying the salaries, administering the pensions, the parties understood that an individual employee with a grievance might include Defendant in any lawsuit against his Center. Thus, it is reasonable to infer that the indemnification clause in the Cooperation Agreements was designed to shield IIE from suits by any individual employees of the Centers, rather

---

1. The indemnity clause at issue in *Hooper* provided:

> (A) AGS shall at all times indemnify and hold harmless Hooper, its successors and assigns and any of its officers, directors, employees representatives, and/or agents, and their heirs, executors, administrators, successors and as-

signs or each of them against and from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees arising out of: ...

(ii) The performance of any service to be performed hereunder;

than from the Centers themselves should IIE breach the contract.

Finally, IIE argues that, even assuming the indemnification clause allows recovery only for claims by third parties, such as individual plan participants employed by the Centers, this suit is in essence a suit by just such individuals, brought on their behalf by the Centers. While it is true that the employees who are individual plan participants will ultimately benefit if the Centers prevail in this lawsuit, IIE has cited no authority for the proposition that an action brought by one party may be imputed to others under these circumstances. Accordingly, IIE's motion for summary judgment is denied with respect to the indemnification clause.

### C.  *Statute of Limitations*

■ Finally, with respect to the Centers' contract claims, IIE argues that, to the extent those claims are based upon breaches occurring prior to August 1988, six years before the lawsuit was filed, those claims are barred by the statute of limitations. In addition to the fact that the Centers' contract claims are based largely upon alleged breaches that occurred after 1988, even the pre–1988 breaches may provide the basis for the Centers' claim pursuant to the continuing performance exception to the six year statute of limitations. "The statute of limitations does not ordinarily run against a continuing contractual cause of action, and if there is an entire continuing contract, the statute of limitations begins to run only from the time when the contract is in some way terminated or when the breach occurs." 31 Am.Jur.2d *Limitations of Actions* § 92 at 666. *See Airco Alloys Division v. Niagara Mohawk Power,* 76 A.D.2d 68, 430 N.Y.S.2d 179 (4th Dept.1980) (where a contract provides for continuing performance over a period of time each breach may restart the running of the statute of limitations).

Here, the Cooperation Agreements called for IIE's continuing performance the Cooperation Agreements were terminated at midnight on December 31, 1992. Accordingly, the six year statute of limitations on the Centers' contract claims began to run on December 31, 1992, and the Centers filed suit in a timely fashion on August 12, 1994.

### II.  *No Fiduciary Relationship Exists Between the IIE and the Centers*

■ Both the Centers and IIE move for summary judgment on the Centers' claim that IIE breached its fiduciary duty owed to the Centers. IIE claims that the disclaimer of fiduciary duty contained in section 2.1(c) of the Cooperation Agreements is dispositive on this issue, and that moreover, because this issue has already been resolved in an earlier opinion of this Court, the law of the case doctrine dictates that no fiduciary relationship can now be held to exist between the parties. *See Asian Vegetable Research and Development Center v. Institute of Int'l Education,* 1996 WL 14448 (S.D.N.Y. January 16, 1996) (the "January opinion"). The Centers argue that the January Opinion was limited to the discovery dispute it resolved, and is not dispositive here.

The provision of the Agreements containing the disclaimer of fiduciary duty reads: *TIAA/CREF, MONY, Generali & Alliance Retirement Plans:* IIE, as Agent, in the name of and for the account of the Sponsor, will act as an intermediary between the Sponsor and the TIAA/CREF, MONY, Generali and Alliance Retirement Plans. IIE's responsibilities include the payment of employer contributions, and other related services as described in Exhibit 1. Nothing in this Section 2.1 shall cause IIE to be a fiduciary with respect to the TIAA/CREF, MONY, Generali and Alliance Retirement Plans.

The January Opinion held:

Under the Cooperation Agreements, the single relationship is between IIE and the Contracting Centers. The language of the Contract is not directly between IIE and any employee of a Center or even between IIE and the Offshore Plan. Plaintiffs draw on and this Opinion has described the fiduciary duty between Plan administrators and Plan beneficiaries, but that is not the relationship described by the contracts at issue here.

Section 3.1 of the Plans makes it clear that IIE is not a fiduciary to the Offshore Plan

because it has no relationship to the Offshore Plan or its beneficiaries. The Second Restatement of Torts explains that "a person in a fiduciary relation to another is under the duty to act for the benefit of the other as to matters within the scope of the relation." Here the contract negotiated by two large sophisticated parties clearly defined the relationship.

*Asian Vegetable,* 1996 WL at *6.

" 'Under the doctrine of the law of the case, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.' " *DiLaura, et al. v. Power Authority of the State of New York,* 982 F.2d 73, 76 (2d Cir.1992) (quoting 1B James W. Moore, Jo D. Lucas and Thomas S. Currier, *Moore's Federal Practice,* para. 0.404[1] at p. 117 (1991)). *See also Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983).

In the January opinion, this Court determined that no fiduciary relationship existed between IIE and the Centers with respect to the Offshore Plan.[2] *Asian Vegetable,* 1996 WL at *7. The Centers contend that the January opinion does not broadly hold that IIE is not the Centers' fiduciary but, instead, narrowly holds that the Centers had not then met their burden of proof on this issue; the Centers therefore contend that the law of the case doctrine is inapplicable. However, parties fully briefed and argued this issue in connection with the discovery motion and the Centers have not put forth any new evidence regarding this issue since the issuance of January opinion, the January opinion controls.

■■■ Furthermore, as a matter of law, no fiduciary relationship exists between the

---

**2.** The Centers had moved to compel IIE to provide documents protected by attorney-client privilege, contending that because IIE acted as the Centers' fiduciary with respect to the Offshore Plan, IIE was prohibited from invoking the attorney-client privilege against them. *Asian Vegetable,* 1996 WL at *4. The Court held that no fiduciary relationship existed between the parties and, consequently, that the fiduciary exception was inapplicable. *Id.* at *7.

**3.** Section 2.1(c) of the Cooperation Agreements reads:

parties. " 'It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed.' " *Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 671, 658 N.E.2d 715 (1995) (quoting *Breed v. Insurance Co.,* 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (quoting *Morlee Sales Corp. v. Manufacturers Trust Co.,* 9 N.Y.2d 16, 19, 210 N.Y.S.2d 516, 172 N.E.2d 280)). Consequently, when the terms of a contract are clear and unambiguous, the contract should be enforced according to those terms. *Wallace,* 86 N.Y.2d at 548, 634 N.Y.S.2d 669, 658 N.E.2d 715.

Section 2.1(c) of the Cooperation Agreements between the Centers and IIE clearly and unambiguously disclaims a fiduciary relationship between the Centers and IIE with respect to the Offshore Plans.[3] The Centers propose an alternate, but strained, reading of this section which this Court rejects. The Centers contend that the disclaimer clause in Section 2.1(c)—which provides that "[n]othing in this Section 2.1 shall cause IIE to be a fiduciary duty"—leaves open the possibility that other contractual provisions or other acts by IIE could and do cause IIE to be a fiduciary of the Centers.

However, because Section 2.1 of the Cooperation Agreements details the services to be provided by IIE to the Centers, and it is from precisely those services that a fiduciary relationship would arise, the disclaimer clause effectively negates a fiduciary relationship between IIE and the Centers. In addition, because the Cooperation Agreements are complete contracts which unambiguously disclaim IIE's fiduciary duty, extraneous evidence cannot be considered in determining this issue.

> *TIAA/CREF, MONY, GENERALI & ALLIANCE RETIREMENT PLANS:* IIE, as Agent, in the name of and for the account of the Sponsor, will act as an intermediary between the Sponsor and the TIAA/CREF, MONY, Generali and Alliance Retirement Plans. IIE's responsibilities include the payment of employer contributions, and other related services as described in Exhibit I. Nothing in this Section 2.1 shall cause IIE to be a fiduciary with respect to the

Lastly, the Centers contend that the disclaimer clause only disclaims IIE's fiduciary duty with respect to fund mismanagement by the trustees, *i.e.*, TIAA/CREF, MONY, Generali and Alliance Retirement Plans. This reading of Section 2.1(c) is unreasonably narrow.

In addition to the unambiguous disclaimer clause in the Agreements, the existence of a fiduciary duty is not supported by the nature of the parties' relationship. "Before courts can infer and superimpose a duty of the finest loyalty, the contract and the relationship of the parties must be plumbed." *Northeast General Corp. v. Wellington Advertising, Inc.*, 82 N.Y.2d 158, 162, 604 N.Y.S.2d 1, 3, 624 N.E.2d 129, 131 (1993). In this case, the relationship between the Centers and IIE, embodied in the Cooperation Agreements, is one between a service provider and its client, and is not fiduciary in nature.

Under New York law, "[w]here parties deal at arm's length in a commercial transaction, no relation of confidence or trust sufficient to find the existence of a fiduciary relationship will arise absent extraordinary circumstances." *National Westminster Bank, U.S.A. v. Ross*, 130 B.R. 656, 678 (S.D.N.Y.1991), aff'd, 962 F.2d 1 (2d Cir.1992) (applying New York law); *see also Beneficial Comm'l Corp. v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770, 772 (S.D.N.Y.1985) (applying New York law). The two parties to this action are sophisticated entities who dealt at arm's length, and the Centers have not demonstrated the extraordinary circumstances necessary to a relation of confidence or trust such that a fiduciary relationship can be held to exist between the parties.

In sum, no question of fact remains as to whether IIE owed a fiduciary duty to the Centers. Therefore, IIE's motion for summary judgment on the Centers' claim of breach of fiduciary duty will be granted and the Centers' motion for summary judgment on this matter will be denied.

> TIAA/CREF, MONY, Generali and Alliance Retirement Plans.

4. The Centers argue that *Frye* stands for the proposition that the question of whether one is a

### III. The Centers' Claim for Malpractice Cannot Be Maintained

■ The Centers claim that because IIE held itself out as a professional plan administrator, the Centers may maintain a malpractice claim against the Centers under New York law. New York law on the scope of professionals appropriately held liable for malpractice is rather limited, and no case specifically addresses the question whether an entity such as IIE is a professional against whom a malpractice claim may lie.

"[M]alpractice means the negligence of a member of a profession in his relations with his client or patient." *Cubito v. Kreisberg*, 69 A.D.2d 738, 419 N.Y.S.2d 578, 580 (1979), aff'd, 51 N.Y.2d 900, 434 N.Y.S.2d 991, 415 N.E.2d 979 (1980); *see also Newsom v. Republic Financial Services, Inc.*, 130 Misc.2d 780, 497 N.Y.S.2d 830, 833 (1985) (essential elements of malpractice cause of action found lacking where defendants were not professionals and thus not in a professional relationship with plaintiff); *Donohue v. Martin*, 97 Misc.2d 973, 413 N.Y.S.2d 99, 100 (N.Y.Sup.Ct.1979) ("a member of any of the professions can be guilty of malpractice").

The Court of Appeals has held that the term "professional" implies knowledge of an advanced type in a given field of science or learning gained by a prolonged course of specialized instruction and study. *People ex rel. Tower v. State Tax Commission*, 282 N.Y. 407, 26 N.E.2d 955 (1940). In *Frye v. Commissioner of Finance of the City of New York, et al.*, 95 A.D.2d 274, 466 N.Y.S.2d 3, 6 (1983), the court outlined the following test as to whether a service is a profession:

> In determining what activity constitutes the practice of a profession, consideration should be given to the following factors: (1) a long-term educational background generally associated with a degree in an advanced field of science or learning; (2) the requirement of a license which indicates sufficient qualifications have been met prior to engaging in the occupation; (3) the control of the occupation by standards of conduct, ethics and malpractice liability; and (4) the barrier to carrying on the occupation as a corporation.[4]

professional is a question of fact for the jury. What the Court held, in reliance on *Matter of*

*See also Rosenbloom v. State Tax Commission,* 44 A.D.2d 69, 353 N.Y.S.2d 544 (1974) (licensed real estate appraiser not engaged in a profession where college degree is not required, no official license is issued, and no barrier exists for corporations to be real estate appraisers).

IIE had no official license which identified it as a "retirement plan" expert, nor was it required to possess a license in order to perform its obligations under the Agreements. Thus, under the test established in *Frye,* IIE was not engaged in the practice of a profession, and cannot be held liable for malpractice. Moreover, IIE is not an accounting firm, an auditing firm, or a financial services firm. Instead, it hired professional firms to provide specialized professional services to the Centers.[5]

Moreover, at least one New York case indicates that courts should not "create [ ] new tort[s]" by expanding the scope of liability for professional malpractice. *See RKB Enterprises Inc. v. Ernst & Young,* 182 A.D.2d 971, 971–72, 582 N.Y.S.2d 814, 816 (3d Dep't 1992) ("there is no cause of action for professional malpractice in the field of computer consulting"). Accordingly, in the absence of precedent, this Court likewise declines to expand the tort of professional malpractice, and IIE's motion for summary judgment will be granted with respect to the Centers' claim for malpractice.

## IV. *The Centers' Claims for Negligence and Gross Negligence Will Be Dismissed*

■ Defendants argue that summary judgment should be granted with respect to the Centers' claims for negligence and gross negligence because IIE owed no duty to the Centers—other than the contractual duty arising out of the Cooperation Agreements—upon which such tort claims can be based.

Under New York law, "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.,* 70 N.Y.2d 382, 389, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987) (citations omitted). While certain cases are readily identified as either contract or tort, others, such as this one, fall "in the borderland between tort and contract." *Sommer v. Federal Signal Corporation,* 79 N.Y.2d 540, 550, 583 N.Y.S.2d 957, 593 N.E.2d 1365 (1992). "These borderland situations most often arise where the parties' relationship is initially formed by contract, but there is a claim that the contract was performed negligently." *Id.*

The New York Court of Appeals has "identified several guideposts for separating tort from contract claims." *Id.* First, Courts look to whether a legal duty exists independent of the contract. In this regard, "merely alleging that the breach of contract duty arose from a lack of due care will not transform a simple breach of contract into a tort." *Id.* (citing *Clark–Fitzpatrick, Inc.,* 70 N.Y.2d at 389, 521 N.Y.S.2d 653, 516 N.E.2d 190).

Where a policy concern dictates the existence of an independent legal duty—such as where the defendant is a fiduciary, or a professional—such a legal duty may be imposed by law as an incident to the parties' relationship, and is not dependent on the parties' contractual relationship. Plaintiffs claim that IIE owes them three duties independent of the contract—a fiduciary duty, a professional duty as an expert plan administrator, and a duty not to commit fraud.

As set forth above, no extra-contractual fiduciary or professional duty is owed by IIE to the Centers. The question of the duty not to commit fraud is not relevant to the viability of the Centers' negligence claims, and will be addressed below in the context of the

*Koner v. Procaccino,* 39 N.Y.2d 258, 263, 383 N.Y.S.2d 295, 347 N.E.2d 658 (1976) was that, for tax purposes, the question of professional status is a question of fact for the tax commission, subject only to limited judicial review. It does not follow from *Frye* that the question of professional status for malpractice liability purposes is a question of fact that precludes summary judgment.

5. Indeed, IIE's lack of expertise in the area of retirement plans was noted by the Centers in the Report of the Centers' Study Team reviewing IIE and other services, in which the Centers acknowledged that "although IIE has acquired considerable knowledge of the subject matter in the process, it is not an expert in the field."

motion for summary judgment as to the Centers' fraud claims.

The second guidepost identified by the Court of Appeals is the nature of the injury, the manner in which the injury occurred, and the resulting harm. *Sommer,* 79 N.Y.2d at 552, 583 N.Y.S.2d 957, 593 N.E.2d 1365. Where the injury alleged is economic rather than injury to person or property, where there was no "abrupt cataclysmic occurrence," and where "the harm was simply replacement cost of the product," New York Courts have rejected negligence claims. *Id.*

This guidepost expresses the longstanding New York rule that "economic loss is not recoverable under a theory of negligence." *AT & T v. N.Y.C. Human Resources Adm.,* 833 F.Supp. 962, 985 (S.D.N.Y.1993) (upholding dismissal of negligence claims where there was "no contention that ... alleged negligence resulted in personal injury or property damage"); *see also Board of Educ. of Hudson Cty. School Dist. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 29, 523 N.Y.S.2d 475, 517 N.E.2d 1360 (1987) (upholding dismissal of negligence claim where "only pecuniary damages" were sought). Notwithstanding, Plaintiffs attempt to cast their claim as alleging personal and property damage to the Plan and its Participants, Plaintiffs claim is one for economic loss, typical of contract, not tort, claims. *See Niagara Mohawk Power v. Stone & Webster Eng.,* 725 F.Supp. 656, 665 (N.D.N.Y.1989) (the term "economic loss" in this context refers to damage other than for physical damage to person or property resulting from an accidental cause).

Finally, with respect to the nature of the injury, here there was no abrupt, cataclysmic occurrence, such as a fire, that would support a tort claim. *Cf. Sommer,* 79 N.Y.2d at 552, 583 N.Y.S.2d 957, 593 N.Y.S.2d 1365 (plaintiffs seeking "recovery of damages for a fire that spread out of control" may maintain tort claim). Accordingly, the nature of the injury and harm alleged by the Centers weigh heavily against allowing the Centers to ground a claim against IIE in negligence.

The third guidepost for determining whether tort claim can be maintained in a contract case is whether the contract provided for services with a significant impact on the public interest. Thus, tort claims have been sustained against an architecture firm alleged to have negligently breached its contract to design and construct a building complex, *see Trustees of Columbia Univ. v. Gwathmey Siegel & Assocs. Architects,* 192 A.D.2d 151, 155, 601 N.Y.S.2d 116 (1st Dep't 1993), and against a fire-alarm company for negligent installation of a fire alarm system. *See Sommer.* In both of these cases, the failure to perform services competently and carefully can have "catastrophic consequences." *Id.*

According to the Centers, IIE's alleged failure to perform its services carefully could result in catastrophic consequences, as such failure could result in the loss of workers' pension funds upon which they counted for their retirement. While there is a public interest in protecting pension funds, that interest can adequately be protected here through contract law; if plaintiffs prevail on their breach of contract claim, the pension funds can be restored to ensure that the various participants' contributions are available to them upon demand. Moreover, that public interest alone is insufficient grounds upon which to base a tort claim, in light of the absence of the requisite allegations of personal injury or property damages.

In sum, the Centers' negligence and gross negligence allegations—that IIE failed to "keep adequate books and records," to "maintain a Complaint Log," to "fully account for each participant's share," and to "reconcile" individual accounts—only arise from IIE's contractual obligations. *See* Complaint ¶¶ 82, 8; *Papa v. New York Tel. Co., et al.,* 72 N.Y.2d 879, 881, 532 N.Y.S.2d 359, 528 N.E.2d 512 (1988) (negligence claim dismissed where no duty independent of alleged contract was pleaded); *Hargrave v. Oki Nursery, Inc.,* 636 F.2d 897, 899 (2d Cir.1980) ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort"); *American Tel. & Tel. Co. v. New York City Human Resources Admin.,* 833 F.Supp. 962, 984–85 (S.D.N.Y.1993) (no basis for a tort claim for negligent performance of

contract under New York law where negligence claims all arise out of the parties' contractual relationship).

Indeed, in stating their claim for negligence, Plaintiffs merely repeat the allegations made with respect to their breach of contract claim. *See* Cmplt. ¶¶ 55–58, 82 and 86. Absent the Agreements, there exists no basis for any of Plaintiffs' negligence claims, as no separate and independent duty to the Centers existed outside of the Agreements. Thus, summary judgment will be granted with respect to the Centers' claims for negligence and gross negligence.

## V. *Fraud*

### A. *The Centers' Fraud Claims Relating to the Coopers & Lybrand Report are Untimely*

■ IIE moves for summary judgment on the Centers' claims for concealment/nondisclosure, negligent misrepresentation, and intentional misrepresentation, arguing that these claims are barred by the applicable statute of limitations.

Under New York law, the statute of limitations for a fraud claim is six years from the commission of the fraud, or two years from the time when the plaintiff discovered the fraud, or could with reasonable diligence have discovered it, whichever is later. N.Y.Civ.Prac.Laws & Rules §§ 203(g), 213(8) (McKinney's 1996). *See, e.g., Ghandour v. Shearson Lehman Brothers, Inc.,* 213 A.D.2d 304, 624 N.Y.S.2d 390, 391 (1995) (citing *Schoen v. Martin,* 187 A.D.2d 253, 589 N.Y.S.2d 443 (1992)). The Centers' three fraud claims allege, *inter alia,* that IIE concealed the contents of a report produced by Coopers & Lybrand in 1986 ("the C & L Report"), which found that IIE was experiencing control problems in the Offshore Plan. Cmplt. ¶¶ 18–23, 101–119.

The Centers learned, or should have learned, of IIE's "control" problems in 1991 when they hired an independent consultant to review IIE's performance. Cmplt. ¶ 18. The consultant "uncovered control problems in IIE's administration and operation of the Offshore Plan and major deficiencies in IIE's performance under the Agreements," and

presented a report to a working group of Center Directors General on February 18, 1992 in Nairobi, Kenya. *Id.* Therefore, the Centers had actual notice of IIE's alleged concealment or misrepresentations of the inadequacy of its controls in 1991, when the consultant was hired, or, at the latest in February 1992, when he presented his findings to the Centers' representatives. This notice triggered the two-year extension of the limitations period, which then ended, at the latest, in February 1994. The fraud claims based upon the C & L Report, which were not brought until August 1994, are untimely.

In April 1992, when IIE released a 1991 internal memorandum, the Centers were again put on notice of the internal IIE problems identified in 1986 by the C & L Report. This memorandum described IIE's administration of the Offshore Plan, and noted the control problems it was experiencing. Cmplt. ¶ 20. Thus, the latest date to which the limitations period can be extended is April 10, 1994, two years after this discovery of the alleged fraud relating to the 1986 C & L Report. Since the Complaint in this action was not filed until August, 1994, Plaintiffs' fraud claims regarding concealment of the contents of the C & L Report are time-barred.

### B. *The Centers' Remaining Fraud Claims*

■ In addition to the fraud allegations regarding the C & L Report, the Complaint alleges more generally that IIE made negligent and intentional misrepresentations, and failed to disclose information, regarding IIE's operation, management and control of the Offshore Plan. Cmplt. ¶¶ 102, 109, 115. IIE contends that to the extent such fraud claims are not time-barred, they should be dismissed because, like the Centers' claims for negligence and gross negligence, they are not independent of the Centers' breach of contract claim.

■ When "an action to recover damages for fraud is premised upon a breach of contractual duties and the allegations supporting the action do not concern representations

which are collateral or extraneous to the agreement, a cause of action for fraud will not stand." *Cleffi v. Crescent Beach Club,* 222 A.D.2d 642, 636 N.Y.S.2d 102, 103 (1995). Thus, where the alleged fraudulent actions arise out of a contractual duty, a plaintiff's only remedy is through a breach of contract action. *See Cleffi,* 636 N.Y.S.2d at 103.

The Centers' allegations of fraudulent conduct on the part of IIE, as with the Centers' negligence claims, relate solely to IIE's duties under the Agreements. For example, the Centers allege that IIE made misrepresentations regarding IIE's adequate and effective operation, management and control of the Offshore Plan on behalf of the Centers. Cmplt. ¶ 115. Any duty IIE had regarding the Offshore Plan, however, was a result of the contractual Agreements between the parties which outlined the rights and responsibilities of the parties. Similarly, the Centers allege that IIE "had the duty to conform to a basic standard of care in carrying out its responsibilities and obligations under the Agreements." Cmplt. ¶ 108. Any such duty of care arose out of the Agreements, since without the Agreements IIE would have no responsibilities toward the Centers. *See Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1177 (2d Cir.1993) ("Every party to a contract commits himself to good faith performance. That does not transmute breach of contract into a tort"). The only duty IIE owed to the Centers existed because of the contractual relationship between the two parties. Any alleged fraudulent conduct on the part of IIE in carrying out its responsibilities under the Agreements, therefore, was a breach of the Agreements. Since a claim for fraud which merely alleges one party's failure to conform to contractual duties is not actionable in New York, summary judgment will be granted in favor of IIE with respect to the Centers' fraud claims.

## VI. *The Centers Have Sufficiently Alleged Damages*

██ Finally, IIE argues that summary judgment on all of the Centers' claims is warranted because the of Centers' inability to demonstrate that they suffered any damages as a result of IIE's conduct. The general rule in New York "is that the plaintiff bears the burden of proving the extent of the harm suffered." *J.R. Loftus, Inc. v. White,* 85 N.Y.2d 874, 877, 626 N.Y.S.2d 52, 649 N.E.2d 1196 (1995). At this stage of litigation, however, the Centers' burden is simply to provide some support for their damages allegation. The Centers have properly alleged damages in this case.

Michael Lewis, IIE's expert, stated that numerous imbalances, unrecorded payments, and overpayments existed in the records of the various plans constituting the Offshore Plan, and that in order to correct the inaccuracies, a total reevaluation of the plan would be required. Furthermore, the Centers have submitted evidence that at the end of 1992, the sum of the balances in the individual pension plan accounts, as shown on their statements, was different than the actual distributable assets available from the offshore plan.

In addition, the Centers allege losses arising from, *inter alia,* IIE's skimming of interest from the Plan by delaying the transfer of the Centers' contributions to Plan vendors; IIE's overcharging the Centers for Fiscal Management Units; and IIE's charging the Centers for services not performed, including administration of the pension plan.

Kathy McKinless, an KPMG Peat Marwick accountant, states that the Fund losses can be calculated by one of two approaches:

One approach to calculating these losses to the Equity Fund is to compare the investment experience reported by Alliance Capital, the investment advisor, with the total investment experience credited by AccuRecord, since any losses had the effect of reducing the AccuRecord investment experience. Alliance reported that $1 invested at the beginning of the Equity Plan in 1985 would have grown to $2.87 at the end of 1992. AccuRecord shows that $1 would have grown to only $2.74. This indicates that unrecorded losses of $1.4 million were sustained by the Equity Fund....

A second approach to calculating the losses to the Equity Fund is to use statistical methods. This was done by identifying each disbursement by payee from records kept at Generali and the Bank of Bermuda. Then for those participants who still had active records as of December 1992 on the

tapes from AccuRecord, total disbursements from Generali and the Bank of Bermuda records were compared to the cumulative sum of all disbursements to that individual contained on those records. From the disbursement reconstruction an error rate on the recording of disbursements by IIE was calculated. Of the over $20 million of disbursements from both Generali and the Bank of Bermuda which could be tracked to the final AccuRecords 1992 records, over $1 million was not recorded by IIE, an almost 5 percent error rate. This rate can then be extended to the total Equity Fund withdrawals to estimate a total error.

The amount of damages to the Offshore Plan is a question of fact for the finder of fact to determine. The Centers have submitted evidence sufficient to establish that various methods of calculations will be available if a jury determines that IIE is liable for breach of its contractual obligations.

### Conclusion

For the reasons stated above, the Centers' motion for summary judgment with respect to its claims for breach of contract and breach of fiduciary duty is hereby denied. IIE's cross-motion for summary judgment with respect to each of the Centers' claims is hereby denied in part and granted in part, as set forth above.

It is so ordered.